97 F.3d 300
 96 Cal. Daily Op. Serv. 7291
 Megan S. ROULETTE, Plaintiff-Appellant,
v.
CITY OF SEATTLE, a Washington municipal corporation; Norman
Rice, Mayor of the City of Seattle; Patrick S.
Fitzsimmons, Chief of the City of
Seattle Police Department,
Defendants-Appellees.
 No. 94-35354.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 8, 1995.
Decided March 18, 1996.
As Amended on Denial of Rehearing
and Rehearing En Banc
Sept. 17, 1996.
 
 David Girard and Peter Greenfield, Evergreen Legal Services, Seattle, Washington, Beth M. Andrus, and David Zuckerman, ACLU-WASHINGTON, Seattle, Washington, for the appellants.
 Mark H. Sidran, Seattle City Attorney, Sandra L. Cohen and Gary E. Keese, Assistant City Attorneys, Seattle, Washington, for the appellees.
 Daniel E. Loeb, Bruce J. Casino, Fried, Frank, Harris, Shriver & Jacobson, Washington, D.C.; Maria Foscarinis, National Law Center on Homelessness & Poverty, Washington, D.C., for amici National Law Center on Homelessness & Poverty, et al., on behalf of the appellants.
 Gary Born, Robert Hoyt, Thomas Clark, Wilmer, Cutler & Pickering, Washington, D.C.; Michael Gallagher, Perkins Coie, Seattle, Washington; Robert Teir, American Alliance for Rights and Responsibilities, for amicus American Alliance for Rights and Responsibilities, on behalf of the appellees.
 Donald A. Lachman, Senior Achievement Non-Profit Housing Association, Seattle, Washington; Camille Monzon, Seattle Indian Center, Seattle, Washington, for amici Senior Achievement Non-Profit Housing Association and Seattle Indian Center, on behalf of the appellees.
 Appeal from the United States District Court for the Western District of Washington, Barbara J. Rothstein, District Judge, presiding.
 Before: PREGERSON, KOZINSKI and LEAVY, Circuit Judges.
 OPINION
 KOZINSKI, Circuit Judge.
 
 
 1
 The first step to wisdom is calling a thing by its right name. Whoever named "parkways" and "driveways" never got to step two; whoever named "sidewalks" did.
 
 
 2
 Seeing the wisdom of preserving the sidewalk as an area for walking along the side of the road, the City of Seattle passed an ordinance generally prohibiting people from sitting or lying on public sidewalks in certain commercial areas between seven in the morning and nine in the evening. SMC §§ 15.48.040.[1] The ordinance doesn't restrict sitting or lying in public parks, private or public plazas, or alleys, nor sitting on the sidewalk in noncommercial areas of the city. It also permits sitting on the sidewalks in the commercial areas at night. No one may be cited, moreover, unless first notified by a police officer that he's sitting or lying where he shouldn't.
 
 
 3
 Plaintiffs come from many walks: homeless people and their advocates, social service providers, a deputy registrar of voters, a street musician, and various organizations like the Freedom Socialist Party and the Seattle chapter of the National Organization for Women. What brings them together, and what defines the class they represent, is that they all sometimes sit or lie on the sidewalk. Plaintiffs claim it is unconstitutional for the city to curtail their use of the sidewalk as a sideseat or a sidebed.
 
 
 4
 They filed suit under 42 U.S.C. § 1983, claiming that the sidewalk ordinance violates their rights to procedural and substantive due process, equal protection, travel and free speech.[2] Plaintiffs moved for summary judgment, asking the district court to declare the ordinance unconstitutional on its face. The district court denied the motion and, instead, granted the city's cross-motion for summary judgment, holding that the ordinance is facially constitutional. Plaintiffs appeal only on First Amendment and substantive due process grounds.[3] We review de novo.
 
 I. FREE SPEECH
 
 5
 The First Amendment protects not only the expression of ideas through printed or spoken words, but also symbolic speechnonverbal "activity ... sufficiently imbued with elements of communication." Spence v. Washington, 418 U.S. 405, 409, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). Spence is a typical symbolic speech case. Appellant there had been prosecuted for displaying an American flag on which he had formed a peace sign with plastic tape.[4] He did so in order to protest American bombing in Cambodia and the National Guard's killing of anti-war demonstrators at Kent State. The context in which he acted made it highly likely that his message would be understood, whereas at another time it "might be interpreted as nothing more than bizarre behavior." Id. at 410, 94 S.Ct. at 2730. His conduct thus amounted to expression, because "[a]n intent to convey a particularized message was present, and ... the likelihood was great that the message would be understood by those who viewed it." Id. at 410-11, 94 S.Ct. at 2730. The Court held the statute unconstitutional "as applied to appellant's activity." Id. at 406, 94 S.Ct. at 2728; see also Texas v. Johnson, 491 U.S. 397, 404, 109 S.Ct. 2533, 2539-40, 105 L.Ed.2d 342 (1989) (burning an American flag as part of a political demonstration was symbolic speech under Spence ).
 
 
 6
 Plaintiffs' claim presents a rarely attempted, and still more rarely successful, twist on the Spence analysis: They argue not that the Seattle ordinance is invalid as applied to a particular instance of sitting on the sidewalk for an expressive purpose, but that the ordinance on its face violates the First Amendment.
 
 
 7
 Plaintiffs observe that posture can sometimes communicate a message: Standing when someone enters a room shows respect; remaining seated can show disrespect. Standing while clapping says the performance was fabulous; remaining seated shows a more restrained enthusiasm. Sitting on the sidewalk might also be expressive, plaintiffs argue, such as when a homeless person assumes a sitting posture to convey a message of passivity toward solicitees.
 
 
 8
 The fact that sitting can possibly be expressive, however, isn't enough to sustain plaintiffs' facial challenge to the Seattle ordinance. It's true that our ordinary reluctance to entertain facial challenges is somewhat diminished in the First Amendment context. See, e.g., Massachusetts v. Oakes, 491 U.S. 576, 581, 109 S.Ct. 2633, 2637, 105 L.Ed.2d 493 (1989). However, this is because of our concern that "those who desire to engage in legally protected expression ... may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S.Ct. 2794, 2801-02, 86 L.Ed.2d 394 (1985).[5] Consistent with this speech-protective purpose, the Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, "by their terms," sought to regulate "spoken words," or patently "expressive or communicative conduct" such as picketing or handbilling. See Broadrick v. Oklahoma, 413 U.S. 601, 612-13, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830.[6] Seattle's ordinance does neither. By its terms, it prohibits only sitting or lying on the sidewalk, neither of which is integral to, or commonly associated with, expression.[7] Subject to other valid legislation, homeless people remain free to beg on Seattle's sidewalks, passively or not. Voter registrars may solicit applications for the franchise. Members of the Freedom Socialist Party may doggedly pursue petition signatures and donations, or distribute educational materials. And the National Organization for Women may hold rallies or demonstrations. Cf. Schneider v. New Jersey, 308 U.S. 147, 160-61, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939) (state may prohibit speaker from "taking his stand in the middle of a crowded street, contrary to traffic regulations ... since such activity bears no necessary relationship to the freedom to speak, write, print or distribute information or opinion.").[8]
 
 
 9
 Plaintiffs and the dissent point to Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), where Justice Fortas, writing for himself and two others, found a breach-of-the-peace statute unconstitutional as applied to a peaceful "sit-in" demonstration. See id. at 138-43, 86 S.Ct. at 722-25 (opinion of Fortas, J., joined by Warren, C.J., and Douglas, J.).[9] To the extent Justice Fortas's opinion in Brown has any bearing in the context of this facial challenge, it supports the city's position. Justice Fortas termed the protest there a "sit-in," but only one of the five defendants actually sat--the other four stood. See id. at 136, 86 S.Ct. at 721 ("Brown sat down and the others stood near him."), 139, 86 S.Ct. at 722 ("They sat and stood in the room, quietly, as monuments of protest...."). The conduct three members of the Court found expressive in Brown thus wasn't the defendants' postures; it was their "silent and reproachful presence," id. at 142, 86 S.Ct. at 724 (emphasis added).[10]
 
 
 10
 In Broadrick, the Supreme Court expressly disavowed its prior cases to the extent they purported to sustain facial freedom of speech attacks on laws like the Seattle ordinance that, by their terms, prohibit only conduct. 413 U.S. at 613-15 & n. 13, 93 S.Ct. at 2916-18 & n. 13. The Court explained:
 
 
 11
 [F]acial overbreadth adjudication is an exception to our traditional rules of practice and ... its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure' speech toward conduct and that conduct--even if expressive--falls within the scope of otherwise valid criminal laws that reflect legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct. Although such laws, if too broadly worded, may deter protected speech to some unknown extent, there comes a point where that effect--at best a prediction--cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe. To put the matter another way, particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.
 
 
 12
 Id. at 615, 93 S.Ct. at 2917-18 (citations omitted).
 
 
 13
 This reasoning is eminently sensible. One might murder certain physicians to show disapproval of abortion; spike trees in a logging forest to demonstrate support for stricter environmental laws; steal from the rich to protest perceived inequities in the distribution of wealth; or bomb military research centers in a call for peace. Fringe acts like these, however, provide no basis upon which to ground facial freedom-of-speech attacks on our laws against murder, vandalism, theft or destruction of property. See Roberts v. United States Jaycees, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984); see also Henry P. Monaghan, "Overbreadth," 1981 Sup.Ct. Rev. 1, 28 ("[T]he core point [of Broadrick is that] the Court will be hostile to facial condemnation of statutes whose central focus is prohibition of tangible harms unrelated to the content of the expression generated by the production of those harms.").
 
 
 14
 The lesson we take from Broadrick and its progeny is that a facial freedom of speech attack must fail unless, at a minimum, the challenged statute "is directed narrowly and specifically at expression or conduct commonly associated with expression." City of Lakewood, 486 U.S. at 760, 108 S.Ct. at 2145; compare Arcara v. Cloud Books, Inc., 478 U.S. 697, 706-07, 106 S.Ct. 3172, 3177, 92 L.Ed.2d 568 (1986) ("where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity," the statute may be subject to First Amendment scrutiny) with City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes--for example, walking down the street or meeting one's friends at a shopping mall--but such a kernel is not sufficient to bring the activity within the protection of the First Amendment.").[11] By its terms, the ordinance here prohibits only sitting or lying on the sidewalk. As we explained above, these are not forms of conduct integral to, or commonly associated with, expression. We therefore reject plaintiffs' facial attack on the ordinance.
 
 II. SUBSTANTIVE DUE PROCESS
 
 15
 Plaintiffs also argue that Seattle's ordinance is facially unconstitutional under the Fourteenth Amendment's Due Process Clause; in plaintiffs' view, the ordinance is nothing more than a thinly veiled attempt to drive unsightly homeless people from Seattle's commercial areas. The city counters that the ordinance is a legitimate response to substantial public concerns. As amicus American Alliance for Rights and Responsibilities explains on the city's behalf, "[a] downtown area becomes dangerous to pedestrian safety and economic vitality when individuals block the public sidewalks, thereby causing a steady cycle of decline as residents and tourists go elsewhere to meet, shop and dine." Brief of Amicus Curiae [American Alliance for Rights and Responsibilities] at 9. We need not reach the merits of these contentions, given the posture of this case: Plaintiffs' substantive due process claim, like their First Amendment claim, challenges the statute on its face, not as applied. "The fact that [a legislative act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987); this has been described as "a long established principle of our jurisprudence." Janklow v. Planned Parenthood, --- U.S. ----, ----, 116 S.Ct. 1582, 1583, 134 L.Ed.2d 679 (1996) (Stevens, J., respecting the denial of the petition for certiorari). Thus the Salerno Court effectively rejected a facial Substantive Due Process challenge because "the statute at issue would be constitutional as applied in a large fraction of cases." Id., citing Salerno, 481 U.S. at 749-50, 107 S.Ct. at 2102-03.
 
 
 16
 Here, plaintiffs have conceded that "the City may prevent individuals or groups of people from sitting or lying across a sidewalk in such a way as to prevent others from passing." Reply Brief of Appellants at 6. This and other aspects of the record make clear that the statute at issue would be constitutional as applied in a large fraction of cases. Plaintiffs' facial Substantive Due Process challenge therefore fails.
 
 
 17
 AFFIRMED.
 
 PREGERSON, Circuit Judge, dissenting:
 
 18
 Two aspects of the majority opinion are troublesome. First, the majority requires plaintiffs mounting a First Amendment challenge to show that the challenged ordinance restricts conduct that is "integral to, or commonly associated with, expression." Maj. at 305. Second, the majority fails to analyze Seattle's sidewalk ordinance under traditional time, place, and manner standards.
 
 
 19
 * Seattle's sidewalk ordinance bans lying or sitting on sidewalks in the city's business areas between the hours of 7:00 a.m. and 9:00 p.m. SMC § 15.48.040(A).[1] The sidewalk ordinance thus makes it illegal for people to communicate, meet, protest, sleep, beg, solicit alms, or engage in other First Amendment activities on Seattle's sidewalks whenever sitting or lying is involved. That this ordinance aims at expressive conduct is evidenced by the ordinance's multiple exceptions that allow sitting and lying in non-expressive situations. SMC § 15.48.040(B).[2]
 
 
 20
 It is undeniable that city sidewalks are public forums meant for a variety of expressive activities in addition to walking.
 
 
 21
 Sidewalks ... are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property.
 
 
 22
 United States v. Grace, 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983). Indeed, because sidewalks are quintessential public forums, courts normally review an ordinance restricting expressive activity on sidewalks under some form of First Amendment scrutiny.
 
 
 23
 But according to the majority, constitutionally protected expressive conduct on public sidewalks is limited to conduct "integral to, or commonly associated with, expression." Maj. at 305. In this way, the majority limits First Amendment protection to conduct already deemed expressive, like flag burning. See maj. at 302-03 (discussing Spence v. Washington, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) and Texas v. Johnson, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989)). In truth, expressive conduct comes in many forms and the Supreme Court has not shied away from recognizing that the First Amendment protects a wide variety of such expression. See R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (burning crosses); Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (live nude dancing); Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (wearing black armbands). From time to time, the Court has even recognized sitting as protected expressive conduct. See Brown v. Louisiana, 383 U.S. 131, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966) (Fortas, J., joined by Warren, C.J., and Douglas, J.) (plurality opinion) (reviewing application of breach of the peace violations involving civil rights sit-in at segregated facility); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961) (same). Yet here, the majority decides that the First Amendment does not protect sitting per se, even though the Court has implicitly recognized that sitting can be a protected form of expression. Id.
 
 
 24
 The majority also brushes aside the Supreme Court's decision in Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). In Clark, the Court suggested that a ban on sitting or lying in a public forum merits at least some First Amendment consideration.[3] Id. at 293, 104 S.Ct. at 3068-69. Although the Court concluded that the Park Service's ban on overnight camping did not violate the First Amendment, the Court did not reject outright the idea that camping could constitute expressive conduct. Id. Instead, the Court assumed that there was some expressive content in overnight camping done in connection with a demonstration. Id. at 293, 104 S.Ct. at 3068-69. Because camping was restricted in a traditional public forum-a park-the Court applied a time, place, and manner analysis. Id. at 294-98, 104 S.Ct. at 3069-71. Granted, the Court gave the Park Service great leeway, Id. at 299, 104 S.Ct. at 3071-72, but the lesson of Clark concerning the method of analysis is clear: even mundane actions-like camping-may merit some level of First Amendment protection. Id. at 293-99, 104 S.Ct. at 3068-72. The majority minimizes Clark 's applicability to this case, and thus gives short shrift to the constitutional concerns presented here.
 
 II
 
 25
 On its face, I believe that Seattle's sidewalk ordinance, with its multiple exceptions for non-expressive activities, requires more careful scrutiny than the majority opinion offers. A correct analysis of the statute should begin, as Clark did, with the assumption that sitting or lying by people in a traditional public forum can have communicative content. This assumption, that sitting or lying on sidewalks may be expressive conduct, is not cut out of whole cloth. It is in line with Supreme Court cases noted above and the law of the Second Circuit. See Loper v. New York City Police Dep't, 999 F.2d 699, 704 (2d Cir.1993) ("the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance"); Streetwatch v. National R.R. Passenger Corp., 875 F. Supp. 1055, 1066 (S.D.N.Y.1995) (ruling that Amtrak could not continue to eject people from Pennsylvania Station in New York City simply because they are homeless or appear homeless).
 
 
 26
 Of course, just because an activity may implicate First Amendment interests does not mean that the government is completely barred from regulating that activity. But the correct method of analysis is not to deny that a First Amendment right is implicated and thus avoid any level of constitutional scrutiny of the ordinance. Rather, courts should determine whether time, place, or manner restrictions on expressive conduct are justified without reference to the content of the expression, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for communicating the information. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989) (citations omitted). Seattle's ordinance is obviously content-neutral; therefore, I conduct three interrelated inquiries: (a) whether Seattle's interests are significant, (b) whether the ordinance is narrowly tailored to effect those interests, and (c) whether there are alternative forums for communicating this expression.
 
 
 27
 * The Seattle City Council drafted the sidewalk ordinance to facilitate the safe and efficient movement of pedestrians and goods on the public sidewalks of commercial areas and to promote economic health in the downtown and neighborhood commercial areas by removing the obstructions to shoppers caused by people sitting and lying on the sidewalk. See Seattle City Council, Statement of Legislative Intent (adopted by the Public Safety Committee meeting held on September 23, 1993) (hereinafter "Statement of Legislative Intent"). On their face, these goals are legitimate and unremarkable.
 
 
 28
 Public safety is a laudable civic objective, see Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 649-50, 101 S.Ct. 2559, 2564-65, 69 L.Ed.2d 298 (1981), and I do not argue that First Amendment activities should be protected at the cost of blocking fire exits, for example. But Seattle's second claim, that it has a significant governmental interest in passing the sidewalk ordinance to preserve the economic vitality of Seattle's commercial areas, is questionable.
 
 The Seattle City Council declared that:
 
 29
 In some circumstances people sitting or lying on the sidewalks deter many members of the public from frequenting [commercial] areas, which contributes to undermining the essential economic viability of those areas. Business failures and relocations can cause vacant storefronts which contribute to a spiral of deterioration and blight....
 
 
 30
 Statement of Legislative Intent. In other words, Seattle seeks economic preservation by ridding itself of social undesirables--homeless or otherwise--who sit or lie on the sidewalks, and this is done to protect the sensibilities of shoppers.
 
 
 31
 Although aesthetics may be a legitimate concern of lawmakers when debating whether to allow signs on utility poles, see Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 805, 104 S.Ct. 2118, 2128-29, 80 L.Ed.2d 772 (1984), such a concern is questionable when evaluating restrictions that directly impede individual expressive conduct. See DeWeese v. Town of Palm Beach, 812 F.2d 1365, 1369 n. 11 (11th Cir.1987). Fear that people may choose to sit or lie on Seattle sidewalks to share their religious or political views, beg or solicit alms, or register voters, is, without more, a less than compelling governmental interest.[4] We should hesitate to accord great weight to "a perceived public interest in avoiding the aesthetic discomfort of being reminded on a daily basis that many of our fellow citizens are forced to live in abject and degrading poverty." Streetwatch, 875 F.Supp. at 1066.
 
 B
 
 32
 Even if we assume that Seattle's interest in ensuring pedestrian safety and preventing urban blight is substantial, the ordinance is still not narrowly tailored to meet those interests. Ward, 491 U.S. at 798, 109 S.Ct. at 2757-58.
 
 
 33
 In Ward, the Court explained that to be "narrowly tailored," an ordinance need not be the "least intrusive means" of achieving the city's desired end. Id. at 798, 109 S.Ct. at 2757. But Ward also cautioned that "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary" to reach the government's desired end. Ward, 491 U.S. at 799, 109 S.Ct. at 2758. Moreover, the Court clarified that a municipality fails the "means-end" prong of the standard when it "regulate[s] expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id.
 
 
 34
 In Project 80's, Inc. v. City of Pocatello, 942 F.2d 635, 638 (9th Cir.1991), we noted that "restrictions which disregard far less restrictive and more precise means are not narrowly tailored." The Supreme Court took up this view in City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n.13, 113 S.Ct. 1505, 1510 n.13, 123 L.Ed.2d 99 (1993). The Court explained that, although a regulation need not be the "least restrictive" means of serving the relevant governmental interest, "if there are numerous and obvious less-burdensome alternatives to the restriction on ... speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." Id.
 
 
 35
 Seattle claims that it enacted its sidewalk ordinance to promote public safety and orderly movement of pedestrians and to protect the local economy by maintaining the aesthetic attractiveness of the "Downtown Zone" and "Neighborhood Commercial Zones," SMC § 15.48.040(A). These are worthy civic goals. But obvious, less-restrictive alternatives to the sidewalk ordinance are already available or can be easily developed.
 
 
 36
 Under Seattle Municipal Code § 12A.12.015, it is a misdemeanor to intentionally obstruct the passage of a pedestrian or vehicle in a public right-of-way.[5] Seattle argues that § 12A.12.015 by itself does not adequately remedy its alleged public safety concerns because the ordinance requires the city to prove "an individual's criminal intent to block the passage of others." Appellees' Brief at 19 n. 22. Seattle could alleviate these concerns by requiring its police to give notice to a person sitting or lying on the sidewalk similar to the notice of violation provided for in the challenged sidewalk ordinance. SMC § 15.48.040(C). Failure to move after being notified that one is obstructing a public right-of-way would provide evidence that a person has "intentionally" obstructed pedestrian traffic. SMC § 12A.12.015(B).
 
 
 37
 Moreover, if easing the prosecutorial burden is the real issue here, then Seattle could easily make it a civil infraction to obstruct pedestrian traffic or to aggressively beg. Such an ordinance, if passed, would make it a violation to obstruct the sidewalk and would thus precisely deal with the pedestrian safety problem and the shopping deterrence problem alleged as significant governmental interests. Alternatively, Seattle could pass a civil infraction ordinance that restricts people from lying and sitting only in the most congested areas, such as those areas near street corners or building entrances.
 
 
 38
 There are other more reasonable means to battle perceived urban blight than the sidewalk ordinance at issue here. If the prevention of harassment or assault is a concern, Seattle could employ traditional law enforcement methods, such as prosecuting those who commit such crimes. See Martin v. Struthers, 319 U.S. 141, 148, 63 S.Ct. 862, 865-66, 87 L.Ed. 1313 (1943). Similarly, if litter and squalor are a concern, punishing those personally responsible is a less-restrictive option. See Schneider v. New Jersey, 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).
 
 
 39
 I am also unconvinced that the sidewalk ordinance is narrowly tailored given the safety and aesthetic problems that the ordinance leaves untouched. For instance, pedestrian safety may be compromised when friends stop to chat on a busy street corner. Safety as well as pleasing aesthetics are threatened when office workers congregate outside of buildings for smoking breaks. Similarly, safety and aesthetics are placed at risk when people sit on the sidewalk while waiting for city buses.[6] Seattle's ordinance doesn't come close to preventing the above mentioned aesthetic and safety concerns, and we should not validate the sidewalk ordinance absent a better means-ends fit.
 
 C
 
 40
 The majority also asserts that plaintiffs remain free to sit and lie expressively in other places in Seattle. Yet one wonders if there are many places in Seattle where homeless people will be welcome, much less allowed to sit or lie on the sidewalk.
 
 
 41
 We have held that an alternative forum is inadequate if the speaker is not permitted to reach his "intended audience." Bay Area Peace Navy v. United States, 914 F.2d 1224, 1229 (9th Cir.1990). In Bay Area Peace Navy, we invalidated a Coast Guard regulation that prohibited protesters from demonstrating within a 75-yard radius of the pier during the annual "Fleet Week" celebration. We found that the 75-yard zone completely insulated the audience from the anti-war and anti-militarization views of the demonstrators. Id. at 1230. This reasoning also applies to other expressive conduct. See Students Against Apartheid Coalition v. O'Neil, 660 F.Supp. 333, 339-40 (W.D.Va.1987) (holding that university regulation prohibiting shanties on lawn of building where Board of Visitors meets, impermissibly insulates the Board, the intended audience, from the protest), aff'd, 838 F.2d 735 (4th Cir.1988).
 
 
 42
 The majority opinion upholds an ordinance that severely restricts people from engaging in expressive conduct while sitting and lying on the sidewalks of Seattle's downtown and neighborhood business zones. The effects are clear. The homeless and their advocates are deprived of the effective use of these sidewalks that are key locations for soliciting alms and making known the plight of the downtrodden. Others are deprived of a good place to sit and share their music, philosophies, or religious beliefs. No other area of Seattle has the density or diversity of audience found in these commercial centers.
 
 III
 
 43
 Our Constitution affords people the "right to be let alone," Olmstead v. United States, 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting), as well as a right to free expression in a public forum, Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). At a minimum, this gives us the right to express ourselves on public sidewalks. If Seattle wants to secure public safety and prevent urban blight, then there are far less-restrictive and more reasonable alternatives to the current sidewalk ordinance. That Seattle has not pursued such alternatives suggests that the city's real objective is to sweep its commercial zones clear of homeless people and other social pariahs.
 
 
 44
 The majority validates an unconstitutional burden on free expression in Seattle's key public forums. Accordingly, I dissent.
 
 ORDER
 Sept. 17, 1996
 
 45
 The opinion filed March 18, 1996 is amended as follows:
 
 
 46
 The petition for rehearing is denied in all other respects. Judge Pregerson would grant the petition for rehearing.
 
 
 47
 A judge called for a vote on the suggestion for rehearing en banc, but the suggestion failed to obtain the votes of a majority of active judges. The suggestion is therefore rejected.
 
 
 48
 PREGERSON, Circuit Judge, joined by TASHIMA, Circuit Judge, dissenting from rejection of suggestion for rehearing en banc:
 
 
 49
 I dissent from the denial of rehearing en banc for the reasons set forth in my dissent above [p. 306], and for the reasons set forth in Judge Norris's opinion.
 
 
 50
 WILLIAM A. NORRIS, Circuit Judge, respecting the denial of rehearing en banc:
 
 
 51
 * In rejecting the facial challenge to the Seattle ordinance on First Amendment grounds, Roulette v. City of Seattle, 78 F.3d 1425 (9th Cir.1996), makes new law by departing from the standard that conduct needs only "a significant expressive element" to merit First Amendment protection. Arcara v. Cloud Books, 478 U.S. 697, 702, 706, 106 S.Ct. 3172, 3175, 3177, 92 L.Ed.2d 568 (1986). Roulette replaces the Arcara standard with a more stringent standard for making facial challenges: A statute directed at conduct cannot be facially challenged unless the conduct is "patently expressive or communicative" or "integral to, or commonly associated with, expression." Roulette, 78 F.3d at 1427-28.
 
 
 52
 Interestingly, the Roulette panel makes its new First Amendment test applicable to facial challenges only. It expressly disclaims any intent to make its new test applicable to as-applied First Amendment claims. Thus, Roulette reserves the right of plaintiffs to bring individual as-applied challenges to the Seattle ordinance, even after denying their right to bring a facial challenge: "Of course, nothing we say today forecloses the possibility of mounting a successful as applied challenge." Id. at 1429 n. 10. In other words, under Roulette, conduct may be sufficiently expressive to mount an as-applied attack on a statute restricting it, but not sufficiently expressive to mount a facial overbreadth attack. As far as I can tell, this dichotomy is unprecedented in First Amendment jurisprudence.
 
 
 53
 None of the cases cited in Roulette supports the dichotomy it creates between facial and as-applied challenges. Most of the cited cases do not discuss the expressive potential of conduct because they involve behavior that is indisputably expressive.[1] The cases that do address whether conduct is sufficiently expressive to come under the protective umbrella of the First Amendment do not distinguish between facial and as-applied claims in their analyses. To the contrary, when discussing the expressive potential of the conduct at issue, cases involving facial attacks borrow their reasoning freely from cases involving as-applied claims.[2] The overlapping of facial and as-applied cases in the analyses shows that the threshold standard for deciding whether the conduct in question is sufficiently communicative to bring First Amendment analysis into play does not vary depending on whether the plaintiff brings a facial or an as-applied claim.[3]
 
 
 54
 The real differences between facial overbreadth and as-applied analyses do not emerge until after a court determines whether the behavior targeted by a statute has sufficient communicative content to trigger the First Amendment. In other words, the threshold inquiry common to both facial overbreadth and as-applied challenges is whether the behavior has "a significant expressive element." Only after the threshold inquiry do the two analyses diverge. In an as-applied challenge, there is a narrow focus on the particular plaintiff's behavior and whether the statute is constitutional as applied to her. In a facial overbreadth challenge, there is a broad focus on the entire range of behavior affected by the statute, and whether the unconstitutional applications of a statute are substantial in relation to the statute's legitimate effect. Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).
 
 
 55
 Under proper overbreadth analysis, if a court determines that a statute regulates behavior with "a significant expressive element," it must then ask whether there are a substantial number of instances in which the statute will violate the First Amendment. See Broadrick, 413 U.S. at 601, 93 S.Ct. at 2910; Yniguez v. Arizonans for Official English, 69 F.3d 920, 932 (9th Cir.1995), cert. granted, --- U.S. ----, 116 S.Ct. 1316, 134 L.Ed.2d 469 (1996). To determine whether the statute's prohibitions on expressive conduct are unconstitutional, a court may have to ask whether the prohibitions are valid time, place, and manner restrictions. See Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 803-17, 104 S.Ct. 2118, 2127-35, 80 L.Ed.2d 772 (1984). Thus, even if conduct hit by a statute is deemed expressive by the threshold inquiry, a facial challenge will fail unless the parties show that the statute hits a substantial amount of protected expression and that its restrictions on this expression violate the First Amendment.II
 
 
 56
 The Seattle ordinance at issue in this case prohibits any person from sitting or lying down on a public sidewalk, or upon an object placed on a public sidewalk, between 7:00 a.m. and 9:00 p.m. in commercial areas of the city. Seattle Mun. Code § 15.48.040. The plaintiffs are political activists, social service providers, a deputy registrar of voters, a street musician, and homeless people. Based on the false dichotomy it creates, the Roulette panel holds that no one can bring a facial overbreadth challenge to the Seattle ordinance because sitting or lying on the sidewalk is not sufficiently expressive to merit First Amendment protection. Sitting or lying on the sidewalk, however, is sufficiently expressive to invoke the First Amendment if a plaintiff brings an as-applied challenge. Roulette, 78 F.3d at 1428 nn. 7 & 10.
 
 
 57
 The Roulette panel holds that a facial challenge to a statute directed at conduct must fail unless the conduct is "patently expressive or communicative" or "integral to, or commonly associated with, expression." Id. at 1427-28. Since a majority of the panel believes that sitting or lying on the sidewalk is not "integral to, or commonly associated with, expression," id. at 1428, it holds that plaintiffs cannot bring a facial challenge to the Seattle ordinance. Thus, the panel never reaches the question of how much expressive conduct the ordinance hits, nor whether the ordinance's restrictions on expression are reasonable time, place, and manner restrictions.
 
 
 58
 The test the panel creates is impermissibly subjective. In applying the new test, the panel interprets "patently" and "integral to, or commonly associated with," as a license to make a completely subjective judgment about the expressive nature of sitting. The panel simply pronounces ex cathedra that sitting or lying on the sidewalk is not integral to, or commonly associated with, expression. There is no discussion of the possible communicative power of sitting, such as the possibility that a beggar's message is dramatized by sitting, instead of standing or walking. Rather, we have only the words "sitting" and "lying" and the imperious conclusion that these activities, when judged in a vacuum, are not sufficiently expressive to make the ordinance vulnerable to a facial overbreadth challenge.
 
 
 59
 It surely cannot be the law that such imperious, subjective reasoning of judges can dictate whether sitting by a speaker, artist, musician, or solicitor is sufficiently expressive to permit a facial First Amendment overbreadth challenge. For example, while the panel belittles the expressive power of sitting, an entire genre of fourteenth century paintings, the Madonna of Humility, is defined by the expressive nature of sitting. As noted by the prominent art historian Millard Meiss, "[T]he humility of the Virgin resided primarily in the single fact that she was seated on the ground." Millard Meiss, Painting in Florence and Siena after the Black Death: The Arts, Religion, and Society in the Mid-Fourteenth Century 132 n. 1 (1951). It is settled law that the First Amendment protects a person's right to choose how to express herself, including her right to decide the manner in which she communicates. Cohen v. California, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). First Amendment inquiry into the expressiveness of conduct must proceed from the speaker's perspective. The panel errs because it proceeds from its own subjective point of view.
 
 
 60
 The correct test for whether conduct is expressive enough to implicate the First Amendment looks at the circumstances surrounding the conduct. See, e.g., id. at 15, 91 S.Ct. at 1783. Conduct triggers the First Amendment when the actor intends to convey a particularized message, and the likelihood is great under the circumstances that the message will be understood by those who view it. Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). Conduct needs only a "significant expressive element" or "at least the semblance of expressive activity" to invoke First Amendment analysis. Arcara, 478 U.S. at 702, 706, 106 S.Ct. at 3175, 3177. Thus, "[t]he fact that sitting can possibly be expressive," Roulette, 78 F.3d at 1427, is enough to trigger First Amendment facial overbreadth analysis. Even conduct that is "[not] necessarily expressive ... [nor] ordinarily expressive" cannot be summarily dismissed as insufficiently expressive to trigger overbreadth analysis. Arcara, 478 U.S. at 702, 106 S.Ct. at 3175.
 
 
 61
 By viewing sitting in a vacuum, the panel majority reaches a foreordained conclusion, since an action devoid of context, though "possibly expressive," can easily be characterized as pure conduct. In examining the medium divorced from the message, the panel ignores the power of the medium to enhance the message. Essentially the panel holds that an ordinance which on its face is aimed only at conduct cannot be subject to a First Amendment facial overbreadth challenge, even if it hits a great deal of protected expression in the process. This theory is unprecedented in First Amendment jurisprudence.
 
 
 62
 The panel insists that its newly minted test is perfectly reasonable, because even without sitting, "homeless people remain free to beg.... [v]oter registrars may solicit applications.... [m]embers of the Freedom Socialist Party may doggedly pursue petition signatures and donations," etc. Roulette, 78 F.3d at 1428. Again, the panel confuses the analysis. The availability of alternative means of expression may be significant in First Amendment analysis, but as part of a time, place, and manner inquiry. See Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753-54, 105 L.Ed.2d 661 (1989); One World One Family Now v. City & County of Honolulu, 76 F.3d 1009, 1012 (9th Cir.1996). Once again, the panel does something that is unique in First Amendment jurisprudence: It uses time, place, and manner reasoning in deciding the threshold question whether First Amendment interests are sufficiently implicated to even permit a facial overbreadth challenge.
 
 
 63
 The cases the panel cites as using the words "patently expressive or communicative," or "integral to, and commonly associated with, expression" fail to support the panel's own use of this language. The panel imports the phrase "commonly associated with expression" from City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 760, 108 S.Ct. 2138, 2145, 100 L.Ed.2d 771 (1988), but that case did not deal with the distinction between expressive and non-expressive conduct. Lakewood involved the circulation of newspapers, and the Court simply described this activity as "expression or conduct commonly associated with expression." Yet, the Roulette panel seizes upon that descriptive language and transforms it into a standard for determining whether conduct is sufficiently expressive to mount a facial challenge.
 
 
 64
 Moreover, the words "patently" and "integral to," used by the panel as part of its new test, do not appear in any of the authorities cited by the panel.[4] In sum, the panel cobbles its test together from its own imagination and language taken out of context.
 
 III
 
 65
 In answering the threshold question in this facial overbreadth case, the panel should have considered whether sitting or lying on the sidewalk has "a significant expressive element," regardless of whether the plaintiff raises an as-applied or a facial challenge. This inquiry requires us to think about concrete instances where the conduct may be expressive. If the panel had considered the expressive elements of sitting or lying on a busy sidewalk in a commercial area, instead of merely indulging its subjective biases about the expressive value of "sitting" in the abstract under its new test, it would have considered that sitting or lying on the pavement may be inextricably intertwined with the messages of street people, and thus sufficiently expressive to permit a facial overbreadth challenge. As Judge Wilken asserted when she issued a preliminary injunction on First Amendment grounds against a Berkeley ordinance almost identical to the Seattle ordinance: "One message which may be communicated by the act of sitting on the sidewalk is the message that the solicitor is in serious need.... [and] too weak, ill, or defeated by circumstances to stand." Berkeley Community Health Project v. City of Berkeley, 902 F.Supp. 1084, 1092-93 (N.D.Cal.1995).
 
 
 66
 If the panel had applied the correct analysis, it would have considered whether many people beg while seated because sitting is a non-threatening posture that signals passivity. Sitting can make the pedestrian feel safe, because that posture suggests that the solicitor is not aggressive and intends no harm. It can also communicate the beggar's degree of desperation, by signalling surrender, weakness, and humiliation, thus altering the character of begging and making the solicitation more effective. There is an indigent woman who sits on a sidewalk along Rodeo Drive in Beverly Hills. Against the background of the retail mecca that literally defines American wealth, the image of this woman, plainly destitute and desperate, sitting against a lamppost, sends a powerful message about the plight of the downtrodden. Perhaps this particular woman chose this particular sidewalk because she believed the most effective means of begging was to confront the rich with her message of abject poverty in the face of their own affluence. And perhaps she chose to sit, placing herself at the feet of the wealthy, to amplify her message of degradation and dependence. In any case, it is presumptuous, if not arrogant, for the majority to disregard such real world possibilities and decide in a vacuum that "sitting" is not sufficiently expressive to trigger a facial overbreadth analysis.
 
 
 67
 Even beyond helping to impart the inescapable message of weakness and humility, sitting may be used to enhance a statement about poverty in general. When a dishevelled man badly in need of a bath chooses to sit on the sidewalk where shoppers toss their cigarette butts and other trash, he conveys a message about the degradation that results from society's failure to accommodate the essential needs of all its citizens. His message addresses what many consider to be the single most compelling problem facing our nation: the growing disparity between the haves and the have-nots.[5]
 
 
 68
 Sitting has, in fact, been closely tied to political messages. There is no question that sit-ins are a paradigm of political protest. See Brown v. Louisiana, 383 U.S. 131, 139, 86 S.Ct. 719, 722, 15 L.Ed.2d 637 (1966) (plaintiffs "sat and stood in the room, quietly, as monuments of protest against the segregation of the library"). No one can question that Gandhi used the posture of sitting to symbolize peaceful, nonviolent resistance.
 
 Conclusion
 
 69
 The Seattle ordinance raises difficult and important First Amendment questions, which should not be dismissed out of hand, the way the panel has done. Without any basis, the panel falsely dichotomizes facial overbreadth and as-applied challenges from the start, and creates a First Amendment test that effectively immunizes the Seattle ordinance, and others like it, from facial challenge. It is especially troubling that the panel gives such short shrift to plaintiffs' facial overbreadth claims, because the Seattle ordinance targets street people, who are among the most powerless in our society. If the real purpose of the ordinance were to combat sidewalk congestion, then the ordinance would have targeted all obstacles to pedestrian traffic. But the ordinance has an express exception allowing people to sit on the sidewalk, so long as they do so on a chair supplied by a merchant. Seattle Mun. Code § 15.48.040(B)(4).[6] Thus, those deemed "desirable" by shopkeepers may sit on the sidewalk and obstruct pedestrian traffic all day long, drinking their cappuccinos and reading their Wall Street Journals to their hearts' content. But someone with an unpopular political message or an unsightly beggar symbolizing the failure of our society to achieve economic justice, may not sit, even to add power and content to his message. As Judge Pregerson said in dissent to the panel's decision, "Seattle seeks economic preservation by ridding itself of social undesirables--homeless or otherwise--who sit or lie on the sidewalks, and this is done to protect the sensibilities of shoppers." Roulette, 78 F.3d at 1432 (Pregerson, J., dissenting). Yet "a bare ... desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." Romer v. Evans, --- U.S. ----, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (quoting Department of Agriculture v. Moreno, 413 U.S. 528, 534, 93 S.Ct. 2821, 2825-26, 37 L.Ed.2d 782 (1973)).
 
 
 70
 Pedestrian safety and the free flow of pedestrian traffic in commercial centers are legitimate municipal concerns. No one argues that cities cannot address the problem of congestion through carefully tailored ordinances. However, municipalities must respect the First Amendment when they formulate their ordinances, and it is our job, in deciding cases such as this one, to provide them guidance in doing so. Roulette offers no guidance to any municipality trying to fashion a remedial ordinance that is consistent with First Amendment values.
 
 
 
 [1]
 The ordinance reads as follows:
 A. Prohibition. No person shall sit or lie down upon a public sidewalk, or upon a blanket, stool, or any other object placed upon a public sidewalk, during the hours between 7:00 a.m. and 9:00 p.m. in the following zones:
 
 
 [1]
 The Downtown Zone
 
 
 [2]
 Neighborhood Commercial Zones
 B. Exceptions. The prohibition in Subsection A shall not apply to any person:
 
 
 [1]
 sitting or lying down on a public sidewalk due to a medical emergency;
 
 
 [2]
 who, as the result of a disability, utilizes a wheelchair, walker, or similar device to move about the public sidewalk;
 
 
 [3]
 operating or patronizing a commercial establishment conducted on the public sidewalk pursuant to a street use permit; or a person participating in or attending a parade, festival, performance, rally, demonstration, meeting or similar event conducted on the public sidewalk pursuant to a street use or other applicable permit;
 
 
 [4]
 sitting on a chair or bench located on the public sidewalk which is supplied by a public agency or by the abutting private property owner; or
 
 
 [5]
 sitting on a public sidewalk within a bus stop zone while waiting for public or private transportation
 
 
 [2]
 Plaintiffs also challenged SMC §§ 12A.12.015, which prohibits aggressive begging. The district court narrowly construed, limited and upheld that ordinance. No one appeals that ruling
 
 
 [3]
 Amici National Law Center on Homelessness & Poverty, et al., also raise right to travel and equal protection arguments in their brief. Because plaintiffs chose not to reassert these arguments, we decline to address them. See Preservation Coalition, Inc. v. Pierce, 667 F.2d 851, 862 (1982)
 
 
 [4]
 For those too young to remember them, peace signs closely resemble the hood ornament on Mercedes-Benz automobiles
 
 
 [5]
 When we allow such challenges, we mostly say we're protecting the free speech interests of "parties not before the Court." See, e.g., Board of Airport Comm'rs v. Jews for Jesus, 482 U.S. 569, 574, 107 S.Ct. 2568, 2572, 96 L.Ed.2d 500 (1987) (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984)). Plaintiffs here are the class of all individuals who have sat or laid down, or will sit or lie down, on public sidewalks in the relevant portions of Seattle. In a sense, then, all the relevant parties are already "before the Court"--and there might therefore be no basis for entertaining a facial challenge at all
 
 
 [6]
 We know of no case decided after Broadrick in the Supreme Court or our court that is inconsistent with this principle. For example, the "disorderly conduct" statute struck down on its face in R.A.V. v. City of St. Paul, 505 U.S. 377, 380, 112 S.Ct. 2538, 2541, 120 L.Ed.2d 305 (1992), by its terms, prohibited placing on public or private property " 'a symbol, object, appellation, characterization or graffiti, including ... a burning cross or Nazi swastika.' " See also Houston v. Hill, 482 U.S. 451, 460-61, 107 S.Ct. 2502, 2508-09, 96 L.Ed.2d 398 (1987) (verbally interrupting a police officer); Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 959, 104 S.Ct. 2839, 2848, 81 L.Ed.2d 786 (1984) (soliciting); Buckley v. Valeo, 424 U.S. 1, 6-7, 16, 58-59, 96 S.Ct. 612, 628-29, 46 L.Ed.2d 659 (1976) (making political contributions and expenditures)
 Similarly, we have held invalid on its face a statute that, by its terms, prohibited barroom topless dancing, BSA, Inc. v. King County, 804 F.2d 1104, 1106, 1109-10 (1986), a form of conduct we held to be expressive for First Amendment purposes, id. at 1107 (citing Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)); see also Chase v. Davelaar, 645 F.2d 735 (1981) (sustaining facial freedom of speech attack on prohibition against topless entertainment in non-theatrical establishments, because "[u]nlike [the statute against draft card destruction upheld in [United State v.] O'Brien, [391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)] the law at issue here] is not attacked for implicating conduct, generally considered non-expressive, which the actor asserts to be communicative").
 
 
 [7]
 Plaintiff Johnny Hahn makes his living as a street musician; he claims it would be impossible for him to play his keyboard instrument without sitting. The district court believed Hahn might have a claim that the ordinance is unconstitutional as applied to him because the ordinance might make it impossible for him to communicate his message. The district court nevertheless correctly held that Hahn's unusual predicament was an insufficient basis for striking down the ordinance on its face
 
 
 [8]
 Plaintiffs also offer evidence that certain of their number would find it difficult to participate in a rally or demonstration unless they could occasionally sit on the sidewalk to rest. The ordinance, however, doesn't apply to people involved in a rally, demonstration or similar event conducted on the public sidewalk pursuant to a street use or other permit, SMC § 15.48.040.B.3, and plaintiffs haven't challenged the permitting procedure
 
 
 [9]
 Justice Brennan concurred only in the judgment; he would have held the statute unconstitutional on its face, without reaching the question of whether the protestors' conduct was protected. Id. at 149-50, 86 S.Ct. at 728-29. Justice White also concurred only in the judgment, on equal protection grounds. Id. at 151-52, 86 S.Ct. at 729-30
 
 
 [10]
 The dissent also cites Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961), for proposition that sitting can be expressive. Diss. at 1431. It stands for nothing of the kind. The Court there reversed several breach of the peace convictions, not because they violated the First Amendment, but because they were "so totally devoid of evidentiary support as to render them unconstitutional under the Due Process Clause of the Fourteenth Amendment." Id. at 163, 82 S.Ct. at 251. The dissent also holds out Clark v. Community for Creative Non-Violence, 468 U.S. 288, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984), as "suggest[ing] that a ban on sitting or lying in a public forum merits at least some First Amendment consideration." Diss. at 1431. True enough. But Clark involved an as-applied challenge, not a facial attack. Id. at 289, 104 S.Ct. at 3066-67. The Court assumed without deciding that the camping in a public park there was expressive, and rejected the as-applied challenge on other grounds. Id. at 293-94, 104 S.Ct. at 3068-69. Nothing in Clark even remotely suggests that camping--or sitting or lying on the sidewalk--is so "commonly associated with expression" as to make a ban on that conduct subject to facial First Amendment scrutiny. City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 760, 108 S.Ct. 2138, 2145-46, 100 L.Ed.2d 771 (1988). Of course, nothing we say today forecloses the possibility of mounting a successful as applied challenge to the Seattle ordinance. See, e.g., n. 7 supra
 
 
 [11]
 Loper v. New York City Police Dept., 999 F.2d 699 (2d Cir.1993), is consistent with this analysis: The statute there prohibited " '[l]oiter[ing], remain[ing], or wander[ing] about in a public place for the purpose of begging' " id. at 701 (emphasis added), and, in the Second Circuit's view, begging is an activity entitled to some First Amendment protection, id. at 704
 
 
 [1]
 Section 15.48.040, entitled "Sitting or lying down on public sidewalks in downtown and neighborhood commercial zones," reads:
 A. Prohibition. No person shall sit or lie down upon a public sidewalk, or upon a blanket, chair, stool, or any other object placed upon a public sidewalk, during the hours between 7:00 a.m. and 9:00 p.m. in the following zones:
 
 
 [1]
 The Downtown Zone, defined as the area bounded by the Puget Sound waterfront on the west, South Jackson Street on the south, Interstate 5 on the East, and Denny Way and Broad Street on the North
 
 
 [2]
 Neighborhood Commercial Zones, defined as areas zoned as Pioneer Square Mixed (PSM), International District Mixed (IDM), Commercial 1(C1), Commercial 2(C2), Neighborhood Commercial 1(NC1), Neighborhood Commercial 2(NC2), and Neighborhood Commercial 3(NC3)
 
 
 [2]
 Subsection B, reads:
 B. Exceptions. The prohibition in Subsection A shall not apply to any person:
 
 
 [1]
 sitting or lying down on a public sidewalk due to a medical emergency;
 
 
 [2]
 who, as the result of a disability, utilizes a wheelchair, walker, or similar device to move about the public sidewalk;
 
 
 [3]
 operating or patronizing a commercial establishment conducted on the public sidewalk pursuant to a street use permit; or a person participating in or attending a parade, festival, performance, rally, demonstration, meeting, or similar event conducted on the public sidewalk pursuant to a street use or other applicable permit;
 
 
 [4]
 sitting on a chair or bench located on the public sidewalk which is supplied by a public agency or by the abutting private property owner; or
 
 
 [5]
 sitting on a public sidewalk within a bus stop zone while waiting for public or private transportation
 
 
 [3]
 Of course, the Court issued a caveat that it was not holding all conduct to be presumptively expressive. See 468 U.S. at 293 n. 5, 104 S.Ct. at 3069 n. 5. But footnote 5 does not preclude First Amendment scrutiny of an ordinance that bans people from sitting or lying on a public sidewalk. Here, plaintiffs provided examples of expressive conduct that involved sitting or lying on sidewalks
 
 
 [4]
 In Pottinger v. City of Miami, 810 F.Supp. 1551 (S.D.Fla.1992), remanded for limited purposes, 40 F.3d 1157 (11th Cir.1994), the court struck down an ordinance under which the homeless were arrested in Miami as overbroad, and ruled that Miami's practice of arresting homeless persons for activities such as sleeping, standing, and congregating in public places violated the Eighth Amendment and the right to travel. Although it was not analyzing the Miami ordinance under strict First Amendment scrutiny, the court nevertheless found that "the City's interest in promoting tourism and business and in developing the downtown area are at most substantial, rather than compelling, interests." Pottinger, 810 F.Supp. at 1581 (emphasis added)
 
 
 [5]
 SMC § 12A.12.015, entitled "Pedestrian Interference," reads as follows:
 A. The following definitions apply in this section:
 
 
 [1]
 "Aggressively beg" means to beg with the intent to intimidate another person into giving money or goods
 
 
 [2]
 "Intimidate" means to engage in conduct which would make a reasonable person fearful or feel compelled
 
 
 [3]
 "Beg" means to ask for money or goods as a charity, whether by words, bodily gestures, signs, or other means
 
 
 [4]
 "Obstruct pedestrian or vehicular traffic" means to walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact. Acts authorized as an exercise of one's constitutional right to picket or to legally protest, and acts authorized by a permit issued pursuant to the Street Use Ordinance, Chapters 15.02 through 15.50 of the Seattle Municipal Code, shall not constitute obstruction of pedestrian or vehicular traffic
 
 
 [5]
 "Public place" means an area generally visible to public view and includes alleys, bridges, buildings, driveways, parking lots, parks, plazas, sidewalks and streets open to the general public, including those that serve food or drink or provide entertainment, and the doorways and entrances to buildings or dwellings and the grounds enclosing them
 B. A person is guilty of pedestrian interference if, in a public place, he or she intentionally:
 
 
 [1]
 Obstructs pedestrian or vehicular traffic; or
 
 
 [2]
 Aggressively begs
 C. Pedestrian interference is a misdemeanor.
 
 
 [6]
 Sitting while waiting for a bus is perfectly legal under one of the exceptions to the ordinance. SMC § 15.48.040(B)(5)
 
 
 [1]
 See R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (holding without discussion that display of symbols is clearly expressive speech); City of Houston v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (holding without discussion that verbal interruption of police officers is speech); Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (holding without discussion that live entertainment, including topless barroom dancing, has long been protected by the First Amendment); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (assuming without deciding that wearing political buttons or using bumper stickers is "arguably protected" conduct)
 
 
 [2]
 See, Village of Schaumburg v. Citizens for a Better Environment, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) (holding solicitation has sufficient "speech interests" to merit First Amendment protection (relying on Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed.430 (1945); Schneider v. State, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939))), Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (holding contributions and expenditures are protected speech (relying on Bigelow v. Virginia, 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Cox v. Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)))
 
 
 [3]
 By creating a more stringent threshold test for facial challenges than for as-applied claims, the Roulette panel also negates the very premise behind the facial overbreadth doctrine. That doctrine was created to enable plaintiffs to bring claims when "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." Broadrick v. Oklahoma, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). Thus, the doctrine rests on the notion that as-applied challenges may not be effective in combatting laws that have a speech-chilling effect because potential plaintiffs will remain silent rather than run the risk of facing civil or criminal penalties if an as-applied defense fails. See Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503, 105 S.Ct. 2794, 2801, 86 L.Ed.2d 394 (1985)
 
 
 [4]
 See R.A.V. v. City of St. Paul, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (discussing pure speech, not conduct); Houston v. Hill, 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987) (same); Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) (holding conduct "so intertwined with speech" deserves First Amendment protection); Schad v. Borough of Mt. Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (holding conduct long held to be protected deserves First Amendment scrutiny); Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (discussing pure speech, not conduct); Chase v. Davelaar, 645 F.2d 735 (9th Cir.1981) (discussing conduct "ordinarily regarded as expressive," but not limiting overbreadth challenges to such conduct)
 
 
 [5]
 A University of Michigan study recently found that the wealthiest 10% of American households held 66.8% of the nation's wealth in 1994, up over 5% since 1989. Meanwhile, the poorest 10% had debts averaging over $7,000, up almost $2,500 since 1989. Keith Bradsher, Rich Control More of U.S. Wealth, Study Says, as Debts Grow for Poor, N.Y. Times, June 22, 1996, at 31. The Census Bureau also reports that the gap between the most affluent Americans and everyone else was wider in 1994 than it has been since the end of World War II. Steven A. Holmes, Income Disparity Between Poorest and Richest Rises, N.Y. Times, June 20, 1996, at A1; see also Robin Wright, U.S. Child Poverty Worst Among Richest Nations, L.A. Times, June 12, 1996, at A22 (reporting UNICEF found United States has highest child poverty rate among world's rich industrialized nations, but also houses world's richest children)
 
 
 [6]
 Seattle Mun. Code, § 15.48.040 provides: